**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGEL LUIS RODRIGUEZ, JR., *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>DEALERTRACK SYSTEMS, INC.,<br><br>Defendant. | No. 2:24-cv-05084-NJC-AYS |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MEMORANDUM OF LAW REGARDING SUBJECT MATTER JURISDICTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................ 6

I. The Harm Suffered by Plaintiff As a Result of Dealertrack's False OFAC Alert Is Sufficiently Analogous to the Harm Associated with Common-Law Defamation. ........... 6

II. Plaintiff Has Shown Multiple Additional Concrete Injuries That Are Fairly Traceable to Dealertrack's False OFAC Reporting. .................................................................. 10

CONCLUSION ............................................................................................................ 14

# TABLE OF AUTHORITIES

Cases

*Adan v. Insight Inv., Inc.*, No. 16-cv-2807, 2018 WL 467897 (S.D. Cal. Jan. 18, 2018) 13

*Adler v. Penn Credit Corp.*, No. 19-cv-7084, 2022 WL 744031 (S.D.N.Y. Mar. 11, 2022) 13

*Elhanafi v. Fox Televison Stations, Inc.*, 966 N.Y.S.2d 345 (Sup. Ct. Kings Cty. 2012) 9

*Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024) 8

*Healy v. Milliman, Inc.*, No. 20-cv-1473, 2022 WL 1061921 (W.D. Wash. Apr. 8, 2022) 14

*Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701, 2022 WL 2841909 (E.D.N.Y. July 16, 2022) 14

*Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701, 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024) 14

*Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236 (11th Cir. 2022) 7

*Kelly v. RealPage Inc.*, 47 F.4th 202 (3d Cir. 2022) 13

*Maddox v. Bank of NY Mellon Trust Co.*, 19 F.4th 58 (2d Cir. 2021) 12, 13

*Nolan v. State of New York*, 69 N.Y.S.3d 277 (1st Dep't 2018) 9

*S&P Pharmacy Corp. v. Syed*, 235 N.Y.S.3d 628 (2d Dep't 2025) 9

*Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024) 1, 7, 8, 10

*Salomone v. MacMillan Publishing Co., Inc.*, 429 N.Y.S.2d 441 (1st Dep't 1980) 9

*Santos v. Healthcare Revenue Recovery Grp., LLC.*, 90 F.4th 1144 (11th Cir. 2024) 9

*Torres v. Equifax Info. Servs., LLC*, No. 21-cv-2056, 2024 WL 3297843 (M.D. Pa. Apr. 17, 2024) 8

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) *passim*

Rules & Statutes

U.S. Constitution, Article III *passim*

15 U.S.C. § 1681, *et seq.* 1, 6, 11, 13, 14

Other Authority

RESTATEMENT (SECOND) OF TORTS § 571 9

**PRELIMINARY STATEMENT**

The undisputed evidence in this case shows that, on at least *five* separate occasions during the morning and afternoon of October 25, 2022, Dealertrack published false "OFAC Check" results to a third party stating that Plaintiff had "[f]ailed" and that Dealertrack had found a "[m]atch" between Plaintiff and a Mexican drug trafficker who was listed on the U.S. Treasury Department's OFAC Specially Designated Nationals sanctions list (the "OFAC List"). These facts are, in all relevant respects, identical to those in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433 (2021), in which the Supreme Court had "no trouble concluding" that a group of 1,853 class members whom TransUnion had labeled as "potential match[es]" to the OFAC List in similar alerts had Article III standing to bring FCRA claims. This should be the beginning and end of any discussion regarding Plaintiff's Article III standing to bring his FCRA claims in this case.

Nevertheless, Dealertrack has persisted in arguing otherwise. Relying on a series of out-of-Circuit cases in which courts have dismissed claims based on a plaintiff's failure to prove "an element from the common-law comparator tort," Dealertrack now argues that Plaintiff lacks standing because he has allegedly failed to prove, in *addition* to publication (which Dealertrack apparently now concedes), certain other "essential" elements of common-law defamation. What this argument ignores, however, is the fact that the Second Circuit has expressly rejected this approach and held instead that "the concrete injury requirement for standing does ***not*** demand that a plaintiff alleging intangible harm identify and establish an 'exact duplicate' in common law." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 n.6 (2d Cir. 2024) (emphasis added).

But even if this Court were to ignore controlling Second Circuit caselaw and adopt Dealertrack's preferred approach here, Dealertrack's attempts to defeat Plaintiff's standing would *still* fail, because its arguments on the other "essential elements" of common-law defamation have no

basis in the factual record of this case. Dealertrack claims, for example, that Plaintiff lacks standing because its OFAC alert—which, even looking only at the incomplete screenshots provided by Dealertrack, stated that Plaintiff "may be a match" to a "Specially Designated Foreign Narcotics Trafficker" living in Guadalajara, Mexico—did not "charge Plaintiff with a crime." Salami can only be sliced so thin before it disappears altogether. Equally baseless are Dealertrack's attempts to pin the blame for Plaintiff's concrete injuries-in-fact on another consumer reporting agency, NCC, which published a separate (and equally false) OFAC alert regarding Plaintiff to Parkway Ford on the same day.

Try as it might, Dealertrack cannot escape the gravity well of *Ramirez*, which squarely controls this case. This Court should deny Dealertrack's proposed motion to dismiss and hold that Plaintiff has Article III standing to pursue his claims.

**BACKGROUND**

In October 2022, Plaintiff began working with Ryan Shear, a salesperson at Parkway Ford in Dover, Ohio, to purchase his dream car, a Ford Mustang Shelby GT 500 (the "Shelby Mustang"). Plaintiff's Counterstatement of Material Facts ("CSMF") ¶¶ 1, 3, 132–34. The Shelby Mustang was a hard-to-find, special-release vehicle for which Plaintiff had been searching for "a little over a year" leading up to October 2022. CSMF ¶¶ 132-34; Plaintiff Dep. at 36:6–10.

On or about October 22, 2022, Mr. Shear collected certain personal information from Plaintiff and provided it to Ron Cihon, Parkway Ford's Finance Manager. CSMF ¶ 4. As required by federal regulations, Mr. Cihon ran an OFAC search through non-party RouteOne, which returned an OFAC report indicating that Plaintiff was a match to a Colombian drug trafficker on the OFAC List named Miguel Angel Rodriguez Orejuela. CSMF ¶¶ 4, 9, 11–12, 13, 107–08, 110. After reviewing RouteOne's OFAC report, Mr. Cihon informed Mr. Shear, who told Plaintiff on October 24 that his purchase of the Shelby Mustang was on hold because of an OFAC report indicating

a match. CSMF ¶¶ 12, 14.

After discussing the RouteOne OFAC Report with Michael Smith, the finance manager at Parkway Honda (a related auto dealership within the Parkway Auto Group), Mr. Cihon decided to use Parkway Honda's version of the Dealertrack Finance & Insurance ("F&I") software to "redo" the OFAC search regarding Plaintiff. CSMF ¶ 17. At 11:09 AM on October 25, in response to Mr. Cihon's OFAC search, Dealertrack published a report to Parkway Ford stating that Plaintiff had "[f]ailed" its OFAC Check and that a "[m]atch" had been "found on OFAC" between Plaintiff and a Mexican drug trafficker:




CSMF ¶ 25; *see also id.* ¶¶ 8, 24, 112–13. Plaintiff, who was born in Ohio and has never lived in Mexico, has a different name and date of birth than this criminal. CSMF ¶¶ 113–17.

Over the next few hours, Mr. Cihon took several steps in an effort to resolve what had now become *two* separate failed OFAC checks (one from RouteOne and another from Dealertrack).

CSMF ¶¶ 9, 64–65, 120, 125. First, at some point between 11:09 AM and 12:37 PM on October 25, Mr. Cihon spoke to Plaintiff by phone and used Dealertrack's F&I software to verify his identity with a series of "out-of-wallet" questions. CSMF ¶¶ 18, 27–29, 32–38. Although Dealertrack's "out-of-wallet" questions can be used to "clear" a failed "Red Flag" report, an OFAC Check is a different product offered by Dealertrack and cannot be cleared with out-of-wallet questions. CSMF ¶ 27. Dealertrack advises its clients that "[i]f a customer fails OFAC, it ***cannot be cleared*** because ***the customer is on OFAC's SDN (Specially Designated Nationals) list***." Ex. J at DT00133 (emphases added):

> **What To Do if a Customer Fails OFAC**
>
> If a customer fails OFAC, it cannot be cleared because the customer is on OFAC's SDN (Specially Designated Nationals) list. It is required by law that you check your customers against OFAC's SDN list. Dealertrack cannot clear a customer who fails OFAC.
>
> If there are any matches against OFAC's SDN list, please contact the **OFAC Hotline at 1-800-540-6322** or visit the **OFAC FAQs: Sanctions Compliance information page at the** U.S. DEPARTMENT OF THE TREASURY **website.**

*Id.* As of 12:41 PM on October 25, despite Plaintiff having already passed the "out-of-wallet" questions, Dealertrack's F&I software still reported his OFAC "Status" as "Failed." CSMF ¶ 36.

Following these "out-of-wallet" questions, Mr. Cihon continued to take additional steps to comply with federal law with respect to Dealertrack's OFAC report: (i) at 12:41 PM, Mr. Cihon ran another OFAC check for Plaintiff using Dealertrack's F&I software, which returned the same "Fail" result as before; (ii) at 1:03 PM and 1:04 PM, Mr. Cihon printed out the results from a pair of "Sanctions List Search[es]" that he had completed on the U.S. Treasury Department's OFAC website; (iii) at 1:59 PM, and then again at 2:00 PM, Mr. Cihon ran yet more OFAC checks for Plaintiff using Dealertrack's F&I software, which continued to return the same "Fail" result as before; and (iv) at 4:51 PM and 4:55 PM, Mr. Cihon printed out the results from another pair of

"Sanction List Search[es]" that he had conducted directly on the Treasury Department's OFAC website. CSMF ¶¶ 36, 76. Thus, as late as 4:55 PM on October 25, Mr. Cihon was "still running the search, even though [Plaintiff] had cleared the out-of-wallet questions." *Id.*

Throughout this period, Plaintiff was experiencing mounting frustration and anxiety about these continued delays—emotions that he expressed directly to Mr. Cihon and others in phone calls and text messages. Plaintiff spoke to Mr. Cihon by telephone at least three times on October 25: (i) at 11:52 AM (for 5 minutes and 16 seconds); (ii) at 12:33 PM (for 6 minutes and 29 seconds); and (iii) at 2:06 PM (for 16 seconds). CSMF ¶ 18. All three of these calls occurred *after* Parkway Ford received the first OFAC "Fail" result from Dealertrack at 11:09 AM. *Id.* Plaintiff also had three additional phone calls with someone on Parkway Ford's general line (possibly Mr. Cihon) on October 25: (i) at 3:03 PM (for 2 minutes and 51 seconds); (ii) at 5:48 PM (for 8 minutes and 39 seconds); and (iii) at 6:15 PM (for 6 minutes and 36 seconds). CSMF ¶ 32. *See also* Ex. Z (log of text messages between Plaintiff and Parkway Ford employee Ryan Shear).

At 3:15 PM on October 25, Plaintiff texted his friend, Adrian Cilona, stating that he was "so pissed off" about having been matched to the OFAC List and "not being able to get the car." CSMF ¶ 37. Plaintiff continued to text with Mr. Cilona about the OFAC match until late in the afternoon on October 25. *Id.* Finally, at 10:31 AM the next morning, Mr. Shear texted Plaintiff: "Good morning Angel, so now that [we] have cleared the OFAC dilemma where do we stand with the options Ron presented?" CSMF ¶ 43. Later that day, at 3:21:41 PM, Plaintiff texted a friend to say that he had received the "green light today" to purchase the car, meaning that he had been notified that he was "cleared for the OFAC flag." CSMF ¶ 37.

A few days later, on October 29, Plaintiff arrived at Parkway Ford to purchase and sign for the Shelby Mustang. CSMF ¶ 48. He was visibly excited at the prospect of finally owning his

"dream car," and he brought several friends to the dealership. CSMF ¶¶ 52, 132. Plaintiff was so excited, in fact, that he brought gifts for the Parkway Ford employees who had helped him to purchase the Shelby Mustang. CSMF ¶ 53. When Plaintiff finally brought home the Shelby Mustang, he cried. CSMF ¶ 132.

A few weeks later, in late November 2022, Plaintiff sent a letter via Certified U.S. Mail to Dealertrack, requesting all information in his consumer file. Ex. M at 16. Later that month, Plaintiff sent a separate letter to Dealertrack via Certified U.S. Mail in which he disputed the contents of his Parkway Ford-related report, identified the inaccurate record, and requested that Dealertrack correct the report. *Id.* Although USPS tracking records indicate that each of these letters was delivered, Dealertrack never responded to either of them. *Id.*

## ARGUMENT

This case begins and ends with *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Indeed, to the extent that Dealertrack's false OFAC alert regarding Plaintiff is different in any meaningful way from the OFAC alerts that the Supreme Court considered in *Ramirez*, it is *worse*: whereas TransUnion's OFAC alert simply stated that its subject was a "potential match" to the OFAC List, *id.* at 433, Dealertrack's alert expressly characterized Plaintiff as having "failed" the OFAC check, stating unambiguously that a "[m]atch" had been "found on OFAC." CSMF ¶ 25.

### I. The Harm Suffered by Plaintiff As a Result of Dealertrack's False OFAC Alert Is Sufficiently Analogous to the Harm Associated with Common-Law Defamation.

In light of the undisputed evidence showing that Dealertrack published its false OFAC alert to a third party (Parkway Ford), Dealertrack no longer disputes that the element of publication has been met here. Instead, Dealertrack argues that this Court should ignore the clear holding of *Ramirez* and instead follow a series of misguided out-of-Circuit decisions in which courts have held that a FCRA plaintiff lacks standing unless he can plead and prove *every* "element from the

common-law comparator tort." ECF No. 49 ("Br.") at 10 (quoting *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236 (11th Cir. 2022)). What Dealertrack fails to mention, however, is this approach, and the *Hunstein* decision from the Eleventh Circuit on which Dealertrack relies, have both been expressly *rejected* by the Second Circuit. *See Salazar*, 118 F.4th at 541, 542 n.6 (disagreeing with *Hunstein* and rejecting the proposition that "an alleged harm isn't closely related to a common-law analog if the plaintiff doesn't plead a required *element* of that analog").[1]

Next, Dealertrack argues that Plaintiff lacks standing because its OFAC alert regarding Plaintiff was not "defamatory upon its face." Br. at 10–12. This is so, Dealertrack claims, because its report merely "noted the (accurate) factual connection between the Plaintiff's name and a name on the OFAC list." Br. at 12. This is a gross misrepresentation of the actual content of the OFAC alert that Dealertrack published regarding Plaintiff, which included, among other things, a depiction of a red "X" next to the phrase "**Failed** Match found on OFAC":




CSMF ¶ 25. But in any event, even if it were true that Dealertrack's OFAC alert regarding Plaintiff stated merely that he "may" have been a match to an entry on the OFAC List, this would *still* represent a sufficiently concrete injury, as it would remain functionally identical to the "*potential* match" language of the OFAC alert at issue in *Ramirez*, which the Supreme Court had "no trouble concluding" resulted in concrete injury-in-fact. *See Ramirez*, 594 U.S. at 432–33. There is zero

[1] Dealertrack's attempt at distinguishing away *Salazar* by inventing a distinction between "every element" and "every *essential* element," *see* Br. at 10 n.3, is without any basis in either law or logic. Every required element of a cause of action is, by definition, "essential."

meaningful difference between saying "may be" a narcotics trafficker and saying someone is a "potential" narcotics trafficker. For that reason alone, *Ramirez* controls. Moreover, even if there were some constitutionally significant difference between "may be" and "potential" (there is not), the additional presence of the red "X" and the word "FAIL" easily push the case into defamatory territory.[2] Indeed, all one has to do to determine whether the report was defamatory is look at the reaction of the dealership employees who reviewed it. The undisputed evidence is that Parkway Ford would not allow Plaintiff to purchase the Shelby Mustang until Dealertrack's false OFAC report was cleared. This report was not defamatory in the abstract—it was concretely defamatory. Dealertrack's report prevented Plaintiff from proceeding with his transaction until it had been "cleared."[3]

Finally, Dealertrack also attempts to distinguish this case from *Ramirez* by claiming that "there is a factual record *disproving* any reputational injury caused by Dealertrack" because the Parkway Ford employees who received the false OFAC report did not actually believe that Plaintiff

[2] Dealertrack also cites to *Torres v. Equifax Info. Servs., LLC*, No. 21-cv-2056, 2024 WL 3297843, at *6 (M.D. Pa. Apr. 17, 2024), claiming that the report there had "similar language" and the court there found the report to be "technically true." Br. at 12. But the OFAC product at issue in *Torres* stated only that the consumer's information (information that included the consumer's date of birth) was "similar to" "the information" of someone on the OFAC list. *Torres*, 2024 WL 3297843, at *2. Further, the court declined to rule on the Article III standing issue and instead decided the merits of the claim. The *Torres* court found that because the report was "technically accurate" and the plaintiff did not make the argument that the report was "materially misleading," the plaintiff's claim failed. *Id.* at *5–8. Here, Plaintiff has not waived any such argument, and Dealertrack's report is both literally false and also misleading. *Torres* is simply inapposite to the issues here.

[3] The real-life effects that Dealertrack's report had on Plaintiff's transaction also show the inapplicability here of Dealertrack's citations to the Fourth Circuit's recent decision in *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 292–93 (4th Cir. 2024). This non-binding decision stems from a misreading of *dicta* in a footnote from *Ramirez*, which the Fourth Circuit wrongly held to require proof that the recipient of a false and defamatory publication also "read and understood" its contents. Regardless, even if Dealertrack's legal arguments were correct (they are not—see *Salazar*, 118 F.4th at 542 n.6), the factual record here would still clearly demonstrate that the recipients of Dealertrack's OFAC alert actually *did* read and understand its contents. *See, e.g.*, CSMF ¶ 36.

was a drug trafficker. Br. at 12-14. Once again, Dealertrack is off the mark. To begin with, the question of whether Parkway Ford employees subjectively believed that Plaintiff was actually a Mexican drug trafficker is entirely irrelevant to the standing inquiry, because "the false reporting itself is the injury." *Santos v. Healthcare Revenue Recovery Grp., LLC.*, 90 F.4th 1144, 1151 (11th Cir. 2024) (cleaned up).[4] This conclusion is fully consistent with the law of common-law defamation *per se*, under which harm is presumed upon publication of certain defamatory statements, such as that someone is a criminal. *See* RESTATEMENT (SECOND) OF TORTS § 571 ("One who publishes a slander that imputes to another conduct constituting a criminal offense is subject to liability to the other without proof of special harm if the offense imputed is of a type which, if committed in the place of publication, would be: (a) punishable by imprisonment in a state or federal institution, or (b) regarded by public opinion as involving moral turpitude."); *S&P Pharmacy Corp. v. Syed*, 235 N.Y.S.3d 628, 631 (2d Dep't 2025) ("A false statement constitutes defamation *per se* if, *inter alia*, it charges another with a serious crime or tends to injure another in his or her trade, business, or profession."); *Elhanafi v. Fox Televison Stations, Inc.*, 966 N.Y.S.2d 345 (Sup. Ct. Kings Cty. 2012) (denying motion to dismiss and holding that subject news story, which included a "juxtaposition of aural and visual imagery [that] create[ed] the portrayal of plaintiffs as Middle Eastern terrorists," met the standards for "libel *per se*").

In any event, the undisputed *actions* of Parkway Ford employees following Dealertrack's false OFAC alert—and the hours-long delay that these actions caused—belie any suggestion that

---

[4] Dealertrack tries to escape this conclusion by pointing to *Salomone v. MacMillan Publishing Co., Inc.*, 429 N.Y.S.2d 441 (1st Dep't 1980), and arguing that common-law defamation requires a plaintiff—even a plaintiff who alleges defamation *per se*—to affirmatively prove reputational injury. Br. at 13–14. But *Salomone*, which was decided over 45 years ago, is not even an accurate reflection of New York law. As the Appellate Division has more recently explained, a plaintiff who alleges defamation *per se* is not also required to present specific proof of reputational harm. *See Nolan v. State of New York*, 69 N.Y.S.3d 277, 283 (1st Dep't 2018).

the employees did not "believe" Dealertrack's reporting. *See, e.g.*, CSMF ¶ 36 (outlining the "numerous steps" taken by Parkway Ford employee Ron Cihon following Dealertrack's OFAC report, including running three additional Dealertrack OFAC checks (each of which failed) and conducting independent research on the Treasury Department's OFAC website).[5]

## II. Plaintiff Has Shown Multiple Additional Concrete Injuries That Are Fairly Traceable to Dealertrack's False OFAC Reporting.

As outlined above, a straightforward application of *Ramirez* to the facts of this case—in which Dealertrack published a false OFAC alert to a third party, Parkway Ford, labeling Plaintiff as a "possible match" to a Mexican narcotrafficker—is all that is necessary to show that Plaintiff has Article III standing. But even without this case's overwhelming factual similarity to *Ramirez*, the evidence produced to date has shown that Plaintiff suffered *other* concrete harms, including delay and emotional distress, that would serve as additional, independent bases for his Article III standing here. *See Salazar*, 118 F.4th at 541 ("Both tangible and intangible harms can satisfy the concreteness requirement.").

By October 2022, Plaintiff had been searching for "over a year" for a dealership that had his "dream car": a Ford Mustang Shelby GT 500. CSMF ¶¶ 132-34; Plaintiff Dep. at 36:6–10. When, after finding such a dealership in Parkway Ford, Plaintiff's purchase of this hard-to-find car was delayed by the multiple false OFAC reports that Parkway received, first from NCC and then from Dealertrack, Plaintiff suffered from understandable frustration and anxiety—emotions that he expressed in many of the dozens of text messages that he exchanged with both his own friends and Parkway Ford employees. *See* CSMF ¶¶ 37, 102; Ex. T at PLF-0000838–39; Ex. Z.

[5] Dealertrack further cites various cases where courts found standing lacking for other claims not at issue and on far different facts. Br. at 9–10. Those cases have no application here given the direct applicability of *Ramirez*.

When these issues were resolved, and he was finally able to close the purchase, Plaintiff displayed an equal-and-opposite *positive* emotional reaction, including bringing a group of friends to the dealership to take photos with the Shelby Mustang, and even giving gifts to the Parkway Ford employees who had helped him to purchase his dream car. CSMF ¶¶ 52–53, 132.

Recognizing the weight of this evidence and its implications for Plaintiff's Article III standing, Dealertrack tries to use NCC as a scapegoat, misrepresenting the timeline of events to make it appear as if none of the delay and emotional distress suffered by Plaintiff could possibly have been caused by *Dealertrack's* violations of the FCRA. Dealertrack argues, for example, that because Parkway Ford's Finance Manager, Mr. Cihon, "clearly understood that Dealertrack's OFAC searches were cleared when a customer correctly answers the out-of-wallet questions," Plaintiff "cannot establish any injury caused by Dealertrack by pointing to events occurring ***after*** Plaintiff passed Dealertrack's out of wallet questions at 12:37 p.m." Br. at 17. According to Dealertrack's own Compliance User Guide, however, a failed OFAC Check returned by the Dealertrack F&I software "***cannot be cleared*** because the customer is on OFAC's SDN (Specially Designated Nationals) list." Ex. J at DT00133 (emphasis added). Instead, according to Dealertrack, the purpose of the "out-of-wallet" questions is to clear "a failed Red Flag," which is a separate type of report. CSMF ¶ 27.

But more importantly, even setting aside Dealertrack's misrepresentations about the purpose of its "out-of-wallet" questions, the evidence also shows that Dealertrack published at least three ***additional*** false OFAC reports—each with the same "Fail" result and the same claim that Plaintiff was a "[m]atch" to a Mexican drug trafficker—to Parkway Ford in the hours ***after*** Plaintiff had supposedly been "cleared" by his correct answers to Dealertrack's "out-of-wallet" questions. CSMF ¶ 36. Although Dealertrack weakly claims that there is "no evidence that these [reports]

were actually generated" or "seen" by Mr. Cihon, Br. at 18, Dealertrack does not deny—and, in fact, has expressly represented to this Court—that each of these reports was requested by Parkway Ford and that each report contained identical results. *See* Rule 16 Conf. Tr. at 20 ("Dealertrack, through Equifax, also ran an OFAC report against Mr. Rodriguez. And our contention is that report, when you look at the face of the report, says 'incomplete.' And so that's . . . they ran it several times, and there are multiple the same – they all say the same thing, to be clear.").

Dealertrack also derides Plaintiff's claims of emotional distress, arguing that Plaintiff has failed to present "corroborating evidence" and that his "own assertions of emotional injury, without more, are insufficient to establish standing." Br. at 16. As a factual matter, this is simply false; the record includes voluminous evidence corroborating Plaintiff's claims of emotional distress, including records of contemporaneous text messages in which Plaintiff expressed his frustration and anxiety to multiple people, including an employee of Parkway Ford. *See, e.g.*, CSMF ¶¶ 69–75, 81–83, 102, 125, 131–135; Ex. Z. But Dealertrack is also wrong on the law. For example, in *Maddox v. Bank of NY Mellon Trust Co.*, 19 F.4th 58, 64–66 (2d Cir. 2021), one of the cases relied upon by Dealertrack, the Second Circuit rejected the plaintiff's "perfunctory" allegation she had suffered "great stress, mental anguish, anxiety, and distress" from the defendant's alleged failure to file a satisfaction of mortgage with the county clerk's office within the one-year statutory deadline. Because the plaintiff had "offer[ed] no reason why the delayed recordation would cause" such an emotional reaction, "especially one wholly incommensurate with the stimulant," the court held that the allegation was insufficient to support standing. *Id.* Here, however, there is nothing incommensurate about Plaintiff's experience of emotional distress at being falsely designated as someone who was a "FAIL" and a "red flag" on his OFAC report, and as someone who "may be" a narcotics trafficker.

*Adler v. Penn Credit Corp.*, No. 19-cv-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) is similarly distinguishable. There, the only evidence of the plaintiff's emotional distress was a set of "vague" assertions at his deposition that he had "sustained an unspecified number of headaches at unspecified frequencies or intervals." 2022 WL 744031 at *9. Citing to *Maddox*, Judge Karas held that the plaintiff lacked standing due in part to his "fail[ure] to offer any detailed reason *why*" the defendant's actions would have caused these emotional reactions. *Id.* (cleaned up). Here, by contrast, in addition to the corroborating evidence mentioned above, the record is replete with evidence that explains the frustration and anxiety suffered by Plaintiff while his purchase of the Shelby Mustang was further delayed by Dealertrack's false OFAC alerts. *See, e.g.*, CSMF ¶¶ 69–75, 81–83, 102, 125, 131–135.

Finally, Dealertrack argues that Plaintiff lacks standing to pursue his reinvestigation and failure-to-disclose claims because (i) Plaintiff mailed his dispute and file-request letters in November 2022, after his purchase of the Shelby Mustang was already complete; and (ii) "there is no evidence of any future credit denial or adverse consequences stemming from Dealertrack's alleged disregard of his dispute letter." Br. at 19. Dealertrack is wrong. In connection with each of these two FCRA claims (and their NY FCRA analogues), Plaintiff has, at a minimum, suffered informational injury, which qualifies as a concrete injury-in-fact. *See, e.g.*, *Kelly v. RealPage Inc.*, 47 F.4th 202, 212–14 (3d Cir. 2022) (plaintiffs had standing to pursue FCRA failure-to-disclose claims against consumer reporting agency because "[t]here were errors in their files" and the defendant's failure to provide the requested information "allegedly impaired their ability to correct these errors"); *Adan v. Insight Investigation, Inc.*, No. 16-cv-2807-GPC-WVG, 2018 WL 467897, at *6 (S.D. Cal. Jan. 18, 2018) ("[T]he alleged failure to provide Plaintiff with written notice of the results of the reinvestigation constitutes a right to information or informational injury.").

In any event, courts in this District and elsewhere have also "routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish standing." *Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK) (RER), 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022), *R&R adopted in relevant part*, 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024) (quoting *Healy v. Milliman, Inc.*, No. 20-cv-1473, 2022 WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022)). As relevant here, this includes a plaintiff's time spent making "futile attempts" to vindicate his or her rights under the FCRA, including to "dispute and obtain a reasonable reinvestigation." *See Hines*, 2022 WL 2841909, at *8; *Healy*, 2022 WL 1061921, at *3.

**CONCLUSION**

For the foregoing reasons, this Court should deny Dealertrack's proposed motion to dismiss and hold that Plaintiff has Article III standing to bring his claims in this action.

Dated: September 12, 2025

Respectfully submitted,

**BERGER MONTAGUE PC**

By: /s/ *Zachary M. Vaughan*
Zachary M. Vaughan
1001 G Street NW, Suite 400 East
Washington, DC 20001
Tel: 215-875-3000
zvaughan@bergermontague.com

E. Michelle Drake (*pro hac vice*)
John G. Albanese (*pro hac vice*)
Ariana B. Kiener (*pro hac vice*)
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612-594-5999
emdrake@bergermontague.com
jalbanese@bergermontague.com
akiener@bergermontague.com

Sophia M. Rios (*pro hac vice*)
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: 619-489-0300
srios@bergermontague.com

*Counsel for Plaintiffs*

**LOCAL CIVIL RULE 7.1(c) COMPLIANCE CERTIFICATION**

The undersigned certifies that the foregoing Memorandum contains 4,398 words (excluding those sections allowed to be excluded in Local Civil Rule 7.1(c), and including footnotes) per Microsoft Word 365's Word Count.

Date: September 12, 2025

*<u>/s/ Zachary M. Vaughan</u>*
Zachary M. Vaughan

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused a copy of the foregoing to be electronically filed with the Court via the CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic-filing systems. Parties may access the filing through the Court's CM/ECF System.

Dated: September 12, 2025

*/s/ Zachary M. Vaughan*
Zachary M. Vaughan